## Case No. 8,588.

### LUCAS et al. v. The THOMAS SWANN.

[6 McLean, 282;[1] 1 Newb. 158; 3 Am. Law Reg. 659.]

District Court, D. Ohio. Oct. Term, 1854.

COLLISION — LIBELLANT BLAMELESS — INEVITABLE ACCIDENT—MUTUAL FAULT—INSCRUTABLE FAULT.

1. A libellant claiming damages on the ground of a collision with another boat, must make it appear that there was no want of ordinary care and skill, in the management of his boat, and that the injury for which he claims compensation, resulted from the sole fault of the other boat. But the faulty management of one boat, will not excuse the want of proper care and skill in the other.

[See The Bayard v. The Coal Valley, Case No. 1,128.]

2. A case of damage resulting from inevitable accident, is defined to be, "that which a party charged with the offense could not possibly prevent, by the exercise of ordinary care, caution and skill."

[Cited in The Johannes, Case No. 7,332.]

3. There is no ground for the conclusion in this case, that the injury was unavoidable; but on the contrary, it is a case of mixed or mutual fault.

4. To constitute a proper basis for a decree apportioning the damages equally to each boat. as in a case of mixed or mutual fault. the evidence must enable the court to find the specific faults of each, from which the injury resulted.

[Cited in The Hudson, 15 Fed. 167.]

5. If the court is satisfied that both boats were in fault. and yet, from the conflict in the evidence. cannot find, with reasonable certainty, the specific faults of each, it constitutes a case of inscrutable fault; and, in such case, in ac-

cordance with the law as settled in the United States, a decree for the equal apportionment of the damages resulting from the injury may be entered. The present is adjudged to be such a case, and a decree is entered in accordance with the principle stated.

[Cited in The Atlas. Case No. 633; The Comet, Id. 3.050; The Mary Patten, Id. 9.223; The J. W. Everman. Id. 7,591; Vanderbilt v. Reynolds. Id. 10,839; Ebert v. The Reuben Doud, 3 Fed. 522.]

[This was a libel by M. E. Lucas and others against the steamboat Thomas Swann (T. Sweeny and others, owners) to recover for damages sustained by collision.]

Walker, Kebler & Force, for libellants.

T. D. Lincoln, for respondents.

LEAVITT, District Judge. This is a case in admiralty, brought by the libellants, as owners of the steamboat Fanny Fern, to obtain compensation for an injury to that boat, by a collision with the steamboat Thomas Swann, of which the respondents are the owners. This collision occurred a little after 4 o'clock in the morning of 28th February, 1854, on the Ohio river, some ten or twelve miles below Wheeling, in the channel between Little Grave Creek bar and the Ohio shore, near the head of the bar, and at the distance of something upwards of one hundred yards from that shore. The Fern was a stern-wheel boat of about 450 tons burthen; the Swann is a side-wheel boat, of the largest class of Ohio packet boats, and was, at the time of the collision, one of the boats of the Union Line, from Louisville to Wheeling.

The libellants allege, that as the result of the collision, their boat immediately sunk in fourteen feet of water; and they claim damages for the full value of the boat, as being a total loss. They also allege, that the injury to the Fern was caused solely by the fault and misconduct of those having charge of the respondents' boat; and set forth as the foundation of their claim for indemnity, that the Fern was descending the river, in the proper and usual place of a descending boat, a short distance above the head of the Grave Creek bar, and that her pilot, noticing the lights of a boat coming up near the Ohio shore, and having no signal from her, when the boats were within from a quarter to less than a half a mile of each other, he gave two taps of the large bell of the Fern, thereby indicating his wish to take the left-hand side of the channel. The ascending boat proved to be the Swann; and the libellants aver, that she made no response to the Fern's bell, and that the Fern continued her course down, in her proper place, when her pilot, seeing the Swann veering across the channel, towards the Virginia side, promptly gave the order for stopping and backing; that the boat was stopped and backed, and every precaution used to prevent a collision; but that the Swann, wrongfully pursuing her course across the channel, struck the Fern nearly at

---

[1] [Reported by Hon. John McLean, Circuit Justice.]

right angles, on the starboard side, near the foot of the stairs, about fifteen feet from the bow of the boat, cutting her about two-thirds through, and causing her to go down in less than one minute.

The respondents, on the other hand, deny that there was any fault or misconduct on the part of those having charge of their boat; and insist that the Fern, before entering the channel between the bar and the shore, was not in the proper place of a descending boat, being not more than thirty yards from the Ohio shore, and so near thereto, that in the line of vision from the pilot-house of the Swann, the lights of the Fern were so blended with the lights on shore at that point, that they could not be distinguished; and that from this cause the pilot of the Swann did not know, and had no reason to suppose, that a boat was coming down, till the bell of the Fern was heard, at which time the boats were not more than 200 or 250 yards apart; and that instantly, on being apprised that a boat was coming down, the pilot of the Swann gave one tap of the large bell, to indicate that he could not take the Ohio side of the channel, and almost simultaneously rang the bells for stopping and backing. The respondents also insist that, when the Fern's bell was heard, the Swann was in the proper place of an ascending boat of her size, at that stage of water, following the channel, and slightly quartering towards the Virginia shore; and that the Fern, being close to the Ohio shore, and with every facility for passing the Swann on that side, had no right to signal for the Virginia side; and that the Fern improperly attempted to cross the channel, and was nearly at right angles with it, when the boats came together. And they insist also, that having made the attempt to cross, she was wrong in stopping and backing; and that the collision was the result of this improper navigation, and not of any faulty conduct on the part of the Swann. It may be noticed here, as one of the facts about which there is no contradiction in the evidence, that the Swann struck the Fern at an angle of about 72° with her stern; and that she sunk near the head of the bar, about one hundred yards from the Ohio shore: her stern being in deep water, and very near the line of navigation usually followed by both ascending and descending boats at that point. This brief outline presents the nature of the controversy between these parties. Their theories and assumptions, both in the pleadings and by the evidence, are in direct conflict; and it may be added, both cannot be sustained. The libellants claim that their boat was without fault and therefore that the respondents are answerable for the whole damage she has suffered from the collision; while the respondents claim that the injury to the Fern was not occasioned by any fault on their part, but is chargeable solely to her mismanagement. The evidence affords no

ground for any unfavorable presumption against either of the parties for any failure to comply with the requirements of the act of congress of 1852 [10 Stat. 61]. Whatever of contradiction there may be in the proofs in other respects, it satisfactorily appears that each of the boats was provided with the requisite signal lights, and that they were in good order at the time of the collision; and also that each was manned with the usual and necessary number of men and officers. And it is specially worthy of notice here, that the proof is ample, on both sides, to show that the pilot of each boat on duty at the time of the collision was, in all respects, trustworthy, and well qualified for the duties of his station.

With a view to some proper basis for a decree in this case, I have carefully read and reflected on the great mass of evidence presented on the hearing, partly oral, but mostly in the form of depositions. In this effort, I have encountered great difficulties, arising from the discrepant and contradictory character of the evidence, for and against the opposite claims of the parties. It is impossible, by any mental process, or upon any known principle of estimating the preponderance of evidence, to decide with even reasonable certainty, in what direction the scale should incline. With equally favorable opportunities of witnessing the occurrences to which they testify, and with the presumption that the witnesses on either side are equally intelligent, truthful and credible, it would seem to be an arbitrary exercise of the discretion of a judge, to reject the testimony given by one party and accredit that given by the other. To show the difficulty, if not the utter impossibility, of sustaining the hypothesis of either of these parties, it is only necessary to state some of the essential features or aspects of the case, in regard to which the evidence is in direct and irreconcilable conflict. And first, it is a conceded fact in the case, that the signal bell of the Fern, the descending boat, was first sounded; but as to the relative position of the boats, when the bell was tapped, and when the pilot of the Swann was apprised that a boat was approaching, the testimony of the parties is essentially variant. The witnesses for the libellants testify that the Fern, at that point, was in the proper place of a down-going boat, some one hundred and thirty yards out from the Ohio shore, and nearly on a line with the inner side of the bar. On the other hand, the respondents' witnesses testify, that when the bell of the Fern was first tapped, she was so near to the Ohio shore, that her lights were blended with, and could not be distinguished from, lights along the shore; thus rendering it impossible for the pilot of the Swann to know that a boat was coming down, until her bell was heard; and also, excluding the descending boat from the right of choosing the outer or Virginia side of the channel, and making it altogether wrong in

her to cross the channel, for the purpose of getting on that side. And the evidence is not less conflicting, in reference to the position of the Swann, the ascending boat, at the point where she was first seen by the pilot of the Fern. On one side, the proof is, the Swann was coming up the Ohio shore; on the other, that she was out in the channel, quartering to the Virginia side. And as to the distance between the boats when the Fern was first seen by the pilot of the other boat, a point of vital importance in the decision of the case, the evidence is very discrepant. The pilot of the Fern swears the distance was near a half a mile, and other witnesses for the libellants state it as upwards of a quarter of a mile; while for the respondents it is proved it did not exceed two hundred and fifty yards, and in the opinion of one witness, was not more than one hundred and fifty yards. There is also a direct contradiction between the testimony of the parties as to the course of the two boats, and their position at the time they came together. The libellants' witnesses swear the Fern was running straight down the river, up to the time when the pilot tapped her bell, and was then turned slightly across towards the Virginia side; whereas the respondents' witnesses say she was running nearly square across the river, and was struck by the Swann almost at right angles. And there is the same conflict in reference to the position of the latter boat. The witnesses for the libellants prove that the Swann turned out from the Ohio shore and was pointed across the channel, towards the Virginia shore, when the collision took place. The witnesses on the other side say her course was not changed from the time the Fern was seen, and was but slightly inclined towards the Virginia shore. And again, while the witnesses on one side state positively that the Swann ran into the Fern, those on the other are equally clear that it was the Fern that struck the Swann. These are some of the points in reference to which the evidence is conflicting, to an extent that makes it difficult to come to a conclusion for or against either of the parties. The libellants, as the result of this unfortunate collision, are the sole sufferers, no injury having been sustained by the other boat; and, as already stated, they claim indemnity for the whole amount of the injury they have sustained. They are entitled to a decree for this, only on making proof that the injury resulted from the fault of those having charge of the respondents' boat, and that there was no want of ordinary care or skill on the part of the libellants, to prevent the collision. On the other hand, it is a well settled principle of maritime law, that the fault of one boat or vessel will not excuse any want of care, diligence or skill in another. Now, if the court was at liberty to regard the evidence for the libellants, to the exclusion of that offered by the other party, there could be no

hesitation in decreeing indemnity for the full amount of the injury. That evidence proves the respondents' boat to have been in fault, without any blame imputable to the libellants. But, if the evidence of the respondents is received and accredited without regard to that adduced by the libellants, the fault would rest upon the boat of the latter; and, the result would be, a decree dismissing the libel, at the costs of the libellants. But for the reasons stated, I am unable satisfactorily to come to either of these conclusions, or enter a decree upon either of the grounds indicated.

Without thinking it necessary, in the view I take of this case, to enter minutely into the examination of the evidence presented on both sides, I am prepared to state, as the conclusion of my mind, that the collision in controversy was not the result of inevitable or unavoidable accident. This is defined to be, "that which a party charged with an offense could not possibly prevent, by the exercise of ordinary care, caution and maritime skill." 2 Dod. 83; 2 Wm. Rob. Adm. 205; Fland. Mar. Law, 298. It is not a reasonable supposition, that the injury sustained by the libellants' boat could have been inflicted, without some fault, and as the mere result of unavoidable necessity. There was, at the time of this occurrence, not less than twelve feet of water in the channel of the river, and it was then rising. At the place where the Fern sunk, near the outer edge of the upper part of Grave Creek bar, there was a depth of fourteen feet. There was deep water the whole width of the channel between the edge of the bar and the Ohio shore, which, at that stage of water, was from one hundred to one hundred and twenty yards wide; and even upon the bar itself there was six feet water. There was then ample verge for these boats to have passed, without coming in contact. And moreover, there is no disagreement in the statements of the witnesses, that the night was calm, and, although somewhat cloudy, not so dark as to render navigation difficult or dangerous. With these facts in view, there would seem to be no difficulty in reaching the conclusion, that there was a censurable want of care, caution, or skill, in the management of these boats; and that the injury cannot be fairly placed to the account of inevitable accident.

It follows from this conclusion, that if this is a case warranting a decree of indemnity, it must be regarded either as one of mixed or mutual fault, or of inscrutable fault. If it be a case belonging to the first of these classes, by the well settled principles of the maritime law—differing in this respect from the common law—the decree must be for an equal apportionment of the injury sustained, between the two boats, with such order in respect to costs, as the court may deem equitable. While I do not affirm that such a decree might not be justified in this case, there would seem to be an objection to such a dis-

position of it. As I understand the maritime law, the court not only must find, as a basis of such decree, that the blame is imputable to both parties, but must find specifically the faulty acts of each, to which the injury is to be charged. As already intimated, it may be well doubted, whether the most searching analysis of the evidence would result in a satisfactory conclusion as to the precise acts which were the direct cause of the collision. The contradictory character of the evidence involves the facts of this case in great doubt, and renders it extremely difficult to attain such a result with reasonable certainty. Nearly every fact stated by the witnesses, imputing censure in the management of either of the boats, is so far impugned by opposing evidence, as to create doubt and uncertainty. In this state of the case, the court would scarcely be justified in assuming a theory, which could only be maintained by arbitrarily repudiating the evidence on one side, and accrediting that offered by the other. For the reasons which will be stated hereafter, there is no necessity for a resort to this desperate expedient, to attain the ends of justice in this case. It is true, there is one exception to the remark just made, that nearly every material fact implicating either boat is contradicted by opposing testimony. It has not escaped the attention of the court, that the evidence shows conclusively, that the Swann, as the ascending boat, failed to give the first tap of the bell, as required under certain circumstances, by the rules of the board of supervising inspectors, adopted pursuant to the steamboat law of 1852. This act of congress confers on this board ample authority to adopt such rules; and they are obligatory in cases to which they fairly apply. And a violation of any of these rules, resulting in disaster, raises a presumption of culpability, which can only be removed by proof that the collision is attributable to some other cause. The rule referred to requires the pilot of an ascending boat, "so soon as the other boat shall be in sight and hearing, to sound his bell," etc. But if, with ordinary diligence, the descending boat is not seen or heard in time to enable the pilot to comply with the rule, no censure can attach for not doing so. It would seem from the evidence of the respondents, that the Fern, from the fact that she was too near the Ohio shore, and from the impossibility of distinguishing her lights from those on the shore, was not seen and known to be a steamboat, until her bell was heard by the pilot of the Swann. This fact would excuse the pilot for not complying with the rule referred to. In reference to some other requirements contained in these rules, which have been noticed in the argument, I have only to say, that I doubt their application to the then state of the river, and the circumstances in which these boats were placed, immediately preceding the collision. There was not only a wide channel between the Ohio shore and the bar, but, in point of

fact, there was water enough on the bar itself, for either of the boats to have passed over it. Without further remarks on this point, I have only to say, in reference to the rules referred to, that they must be construed in subordination to the paramount rule of navigation, that a collision must always be avoided if possible; and an injury inflicted will not be justified, unless inevitable, on the ground that the injured boat had violated a prescribed rule. But I do not propose to enter into an elaborate inquiry, whether this is a case of mixed or mutual fault, justifying a decree on that basis. In my judgment, there are, as before intimated, obstacles in the way of entering such a decree in this case. And as it may be disposed of on another principle, according, as I think, with strict justice and the doctrines of the maritime law, I prefer to place it on that ground. In its results, so far as the interests of these parties are concerned, the decree which I propose to enter, for an equal apportionment of the loss sustained by the collision, is the same as if based on the finding of mixed fault.

As already intimated, I cannot upon the evidence before me, with any reliable certainty, adopt the conclusion, that the injury suffered by the libellants arose from the sole fault of those in charge of the respondents' boat; nor can I find the reverse of this proposition to be satisfactorily established, and thus hold, that the respondents are absolved from all liability for the injury sustained. It is equally clear, for reasons before adverted to, that this injury cannot be fairly charged to inevitable accident. It is a fair deduction from the facts before the court, that the cause of this collision is to be found in the faulty management of one or both of these boats. And I have no hesitation in concluding, that in the excitement produced by the occasion, the pilots of both were in fault. This is a reasonable implication from all the circumstances involved in the transaction. And yet, from the conflict in the evidence, as before remarked, it is difficult, if not impossible, to determine to what direct and specific acts the collision is to be attributed. And this, as I understand the maritime law, makes it a case of damage or loss, arising from a cause that is inscrutable. It is not, of course, to be inferred from this, that any doubt exists that the immediate cause of the injury to the Fern, was the collision between the boats; but it implies that the causes which led to this result are involved in obscurity and doubt.

In this view it only remains to inquire what decree shall be made in this case. This is the only occasion on which this point has been before this court, and I confess, that from my limited experience in the administration of maritime law, I enter upon its consideration with some hesitancy, and with great reason to distrust the conclusions to which I might be led, unaided by the light which others have thrown upon the subject.

It is insisted by the counsel for the respondents, that the maritime law gives no redress for an injury resulting from the collision of boats or vessels, unless the court can find from the evidence that it was the result of the sole fault of one; or that it was mixed or mutual fault. This ground supposes that there can be no decree for an apportionment of the loss, if, for any reason, the cause of the injury is inscrutable, or left in such doubt that there can be no satisfactory finding of specific facts. The English admiralty decisions referred to by counsel would seem to sustain this position. They certainly show, that where the cause of the injury is inscrutable, and the proof does not implicate either of the parties as in fault, there can be no decree for an apportionment of the loss. I do not think they establish it as the law in England, that where there is reason to conclude one or both parties were in fault, but the evidence leaves it uncertain which, that no decree can be rendered for a contribution by moieties. I do not, however, propose a critical examination of these cases, as I consider the question referred to as satisfactorily settled in this country. In his commentaries on Bailments (sections 609, 610), Judge Story discusses this question, and maintains the right and expediency of dividing the loss, as between colliding vessels, where the fault is inscrutable. His language is: "Another case has been put by a learned commentator on commercial law. It is, where there has been some fault or neglect, but on which side the blame lies is inscrutable, or is left by the evidence in a state of uncertainty. In such a case, many of the maritime states of continental Europe have adopted the rule to apportion the loss between the vessels." The writer referred to by Judge Story is Mr. Bell, whose commentaries on the laws of Scotland have given him a distinguished reputation as a jurist. And in reference to the doctrine asserted by this author, Judge Story remarks, that "if the question be still open for controversy, there is great cogency in the reasoning of Mr. Bell, in favor of adopting the rule of apportioning the loss between the parties. Many learned jurists have supported the justice and equity of such a rule; and it especially has the strong aid of Pothier, and Valin, and Emerigon." In a note appended to the section before cited, Judge Story has inserted the argument of Mr. Bell in the maintenance of his views; the force and clearness of which certainly entitle it to the highest consideration. I am not informed whether the doctrine, thus approvingly referred to by Judge Story, has been distinctly asserted by him in any case calling for its judicial recognition. But another learned American judge, eminent for his profound research in the doctrines of the maritime law, and his able and judicious administration of that law, holds the rule for the apportionment of damages, in cases of an injury by collision, where the fault is uncertain or inscrutable, as indisputable, in the United States. In the case of The Scioto [Case No. 12,508], Judge Ware, the learned judge of the United States for the district of Maine, says: "This rule in admiralty—a contribution by moieties—seems to prevail in three cases: First, where there has been no fault on either side; second, where there may have been fault but it is uncertain on which side it lies; and third, where there has been fault on both sides." In the syllabus of this case, the point is stated thus:—"But if it—the collision—happens without fault in either party, or if there was fault, and it cannot be ascertained which vessel was in fault, or if both were in fault, then the damage and loss are divided between them, in equal shares." I may be permitted to remark, though I have not seen the reported cases, that I am informed that since the decision in the case of The Scioto, before referred to, Judge Ware has asserted the same principle in other cases. To what extent other American judges have affirmed it, I have not the means of information. But having the high sanction of Story and Ware—both known as able exponents of the maritime law—and sustained, too, by the most distinguished jurists of continental Europe, I have no hesitancy in applying it to the case before the court. A late elementary writer on maritime law in this country, of high reputation for accuracy and learning, affirms, that "without question, the doctrine above stated is the American law on this subject." This writer says: "Where the collision is evidently the result of error, neglect, or want of precaution, which error, neglect, or want of precaution is not directly traceable to either party, but is inscrutable, or left by the evidence in a state of uncertainty, there the rule of the maritime law is, that the loss must be apportioned between the parties, in equal moieties." Fland. Mar. Law, 296. This writer admits that a different rule prevails in England, but very justly remarks "that the rule adopted in England does not necessarily determine the law for us, in the United States. And accordingly, we find that the courts of admiralty in this country adhere to the rule of the ancient maritime law." Id: 298.

Adopting this view of the law, and satisfied that the application of the principle adverted to meets the real equity of the case, I shall decree an equal apportionment of the loss between the parties. As already stated, the contradictory and irreconcilable character of the evidence leaves the mind in doubt and uncertainty, as to some of the important facts in the case; but there is a satisfactory ground for the conclusion that both the colliding boats were in fault, and therefore that each shall contribute to the loss. And I may remark here, that in my judgment, the enforcement of the principle here sanctioned, is not only vindicated as in itself just and equitable, but in its application to the navi-

gation of the western waters, as altogether expedient. Heretofore, in cases of collision, the great object of each party has been to prove his adversary exclusively in the wrong, and thereby avoid all pecuniary liability. And it is almost proverbially true, that in collision cases, each party has but little difficulty in sustaining, by the proofs, any state of facts which may be insisted on. In most cases, the witnesses on either side, from a misapprehension of the facts, or a dishonest purpose of representing them falsely, involve the transaction in such doubt and uncertainty as to render it impossible to reach a satisfactory conclusion. If, under such circumstances, a reasonable ground is furnished for the conclusion that there is fault on both sides, and that each party should share in the loss sustained, there would be greater caution and vigilance in navigation, and less effort and less temptation, by corrupt or unfair means, to misrepresent or distort facts. It appears satisfactorily, that the injury resulting from the collision fell almost exclusively on the Fern. The injury to the Swann is so slight that the respondents have set up no claim to remuneration. The result, therefore, of the decree will be, that one-half of the actual loss or injury sustained by the Fern, must be paid by the respondents. The value of the Fern is variously estimated by the witnesses who have testified on that subject, at sums ranging from $12,000 to $20,000. For the purposes of this decree, the court fix her value at $15,500. There is proof in the case that the Fern has been raised, but no evidence was offered of her value, including her engine and machinery, after the collision. This value, whatever it may be, will be deducted from the sum of $15,500, and the respondents are decreed to pay the libellants one-half of the balance. It will be necessary to appoint a commissioner to inquire into and report the value of the Fern after the injury. This will be provided for in the decree to be entered. In reference to the costs, under the circumstances of the case, no discrimination will be made between the parties, and they will therefore be paid equally.